IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Preston Brown,                 )

                     )

        Plaintiff,       )    Case No. 15 C 50154

                     )

  vs.                   )

                     )

Northern Illinois University,   )    Judge Philip G. Reinhard

                     )

        Defendant.    )

## ORDER

For the reasons stated below, defendant's motion [64] for summary judgment is granted in part and denied in part. Summary judgment is granted as to the Title VII claim set forth in Count I and denied as to the Equal Pay Act claim set forth in Count III. The Title VII retaliation claim set forth in Count II is dismissed per plaintiff's request. The parties are directed to contact Magistrate Judge Johnston within thirty days of the entry of this order to schedule a settlement conference or arrange for mediation.

## STATEMENT-OPINION

Plaintiff, Preston Brown, brings this action against defendant, Northern Illinois University ("NIU"), his former employer, claiming, in his amended complaint [48], discrimination based on race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII") (Count I) and a violation of the Equal Pay Act, 29 U.S.C. §§ 206(d), 215(a), & 216 et seq., (Count III).[1] Defendant moves [64] for summary judgment.

The facts are taken in the light most favorable to plaintiff, since he is the non-moving party. Jaburek v. Foxx, 813 F.3d 626, 630 (7th Cir. 2016). Plaintiff is an African-American male. He began working for defendant in February 2010. He worked as a graduate assistant from then until summer 2012. From July to November 2012 he worked as extra help. On December 1, 2012, he was appointed to the position of Research Associate to the Associate Vice President of Enrollment Management in the Department of Enrollment Management. His duties included retrieving and analyzing data, creating reports, providing recommendations regarding the reports, providing recommendations following review of the reports, attending meetings,

---

[1] The amended complaint also included a Title VII retaliation claim (Count II) but plaintiff has elected not to pursue that claim and asks that it be dismissed. Pl. Resp. Memo., p. 1 [73].

working on hiring committees as assigned, and assisting the Associate Vice President of Enrollment Management with the duties of the office. He was supervised by Kimberly Buster-Williams from December 2012 to June 2014, Dr. Eric Weldy[2] from July 2014 to January 2015, and Dani Rollins from January 2015 to March 2015.

In August 2013, plaintiff took the responsibilities of a half-time research associate in the department of testing services. Plaintiff met with the individual who was leaving the half-time research associate position, identified tasks that needed to be done, and notified his supervisor of the tasks that needed to be done. These duties included uploading data from the Hobsons software system[3], manually reviewing uploaded data for accuracy, and managing relationships with vendors. Plaintiff was directed by his supervisor, Kimberly Buster-Williams to perform these duties until they could be reassigned but the duties were never reassigned from plaintiff. In October 2013, plaintiff took over the duties of the Associate Director of Admissions handling the marketing efforts of the university, the management of the Hobsons software system, and the overall oversight of all of the software duties. From July 2014 through March 2015, plaintiff had two graduate assistants working for him. He did not supervise anyone but these two graduate students.

Buster-Williams, an African-American woman, was initially hired as the Director of Admissions. After her first year, in 2012, she took on the additional position of Acting Associate Vice President for Enrollment Management. She held both positions simultaneously for one year. While she was working both positions she was paid an additional $20,000 per year. She then moved to strictly being the Acting Associate Vice President of Enrollment Management for her final year at NIU.

From some time in 2011 to October 2013 Michele Hill, a white woman, served as Associate Director of Admissions for Marketing and Hobsons at NIU. In October 2013, plaintiff took over the responsibilities of this position. Hill then supervised the call center. Hill's salary was not reduced after this change even though she had less responsibilities than previously. She continued to be paid $15,000 per year more than plaintiff.

Crystal Garvey, a white woman, was the Coordinator of University Admission Systems. In 2014 she also took over all the duties of the Director of Undergraduate Admissions in addition to continuing to work as the Coordinator of Undergraduate Admissions Systems. Garvey was given additional pay starting in June 2014 and continuing into 2015 for serving as the Director of Undergraduate Admissions. As Director of Undergraduate Admissions, Garvey supervised twelve to fifteen admissions counselors and other staff. Dr. Weldy testified that Garvey did not request additional pay for taking on these duties but that he decided to give her additional pay

---

[2] Dr. Weldy is the Vice President of Student Affairs and Enrollment Management at NIU. Dr. Weldy is an African-American man.

[3] Hobsons is a customer relationship management program.

because he was asking her to do her current job as well as to do an additional job for a short period of time.

Dr. Daniel House, the Director of Institutional Research, took on the additional duties of the Associate Vice President for Enrollment Management when Buster-Williams left NIU. He continued to serve as the Director of Institutional Research while taking on these additional duties. As Associate Vice President for Enrollment Management, Dr. House's duties included supervising plaintiff and collaborating with Dr. Weldy, the Vice President of Student Affairs and Enrollment Management. Dr. House was given additional compensation for taking on these additional duties. Dr. House is a white man.

Dr. Weldy had the ultimate say on signing off on requests for additional pay for employees in his division. Whether the employee ended up getting the additional pay had to be approved by Human Resources after Dr. Weldy signed-off on the request. Plaintiff requested additional pay from Dr. Weldy in September or October 2014 and again in January 2015. Dr. Weldy was unwilling to sign-off on plaintiff's request for additional compensation for performing the additional duties assigned to plaintiff. Plaintiff testified he worked approximately 37.5 to 45 hours per week in the period July 2014 to March 2015.

Sharon Handelsman served as special assistant to Dr. Weldy and interim director of admissions beginning in August 2013. She testified in her deposition that she had asked that plaintiff be given additional money before taking over Hobson's responsibilities from Hill. She testified she asked for the additional compensation because of the overall amount of work plaintiff was doing. She testified that even prior to taking on part of Hill's responsibilities, he was doing a lot. Dkt # 72-1, p. 42.

Handelsman also testified that though plaintiff did not officially report to her, after Buster-Williams left, he, in effect, reported to her. She testified she never had any problems with plaintiff's performance. Dr. Weldy testified in his deposition that Handelsman had given him negative feedback on plaintiff's job performance. He testified the negative feedback was "[j]ust really his general knowledge of the [Hobsons] analyst system or lack thereof. Also from the standpoint of his desire to do work and to follow through." Dkt # 65-4, p. 54-55.

Plaintiff filed a grievance with the university based on his not receiving additional compensation for the additional duties he was assigned. This grievance did not mention any discrimination based on race or gender. In connection with this grievance, plaintiff submitted time sheets showing his hours worked. Dr. Weldy testified in his deposition that he was concerned by the hours plaintiff listed as worked because "those were the hours that someone at a VP or presidential level would work." Dkt # 65-4, p. 56-57. When asked if he believed the hours reported were true and correct and showed the amount that plaintiff worked during those time periods, Dr. Weldy responded: "Personally, no." Dkt # 65-4, p. 58. In its LR56.1 statement of facts, defendant states that Dr. Weldy's response to plaintiff's grievance was "that the denial of the grievance was based on budgetary restraints of the university and the fact that employees throughout the university were asked to take on new or additional duties without additional

3

financial compensation." Dkt # 65, ¶ 51. Plaintiff agrees this was Dr. Weldy's testimony. Dkt # 71, ¶ 51 Resp.

 Plaintiff tendered his resignation and ceased working for NIU in March 2015. On April 3, 2015 plaintiff filed an EEOC charge alleging NIU did not adequately compensate him and constructively discharged him because he is an African-American male. On April 8, 2015, the EEOC issued plaintiff a right-to-sue letter regarding the April 3, 2015 charge. Plaintiff filed a second EEOC charge, on June 9, 2015, alleging retaliation and discrimination based on race and sex. The EEOC issued plaintiff a right-to-sue letter on this charge on January 4, 2016.

 To survive summary judgment in a Title VII case, plaintiff must point to evidence in the record which "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." David v. Board of Trustees of Community College District No. 508, 846 F.3d 216, 224 (7th Cir. 2017). The court's role "is not to inquire into the wisdom of an employment decision, but simply to determine if the employer is dissembling to cover up a discriminatory purpose." Id., at 229 (quotation marks and citation omitted).

 Plaintiff contends his race and gender were the reason he did not receive additional pay for additional duties. Plaintiff's evidence can be summarized as follows: 1) he is African-American and a man and, at certain times during the course of his employment, employees holding different positions than his, who were either white or women or both, received additional compensation for taking on additional job duties while he did not; 2) Dr. Weldy did not believe plaintiff worked all of the hours plaintiff put on the time sheets plaintiff attached to his grievance; 3) Dr. Weldy's testimony that Handelsman had given negative feedback as to plaintiff's job performance contradicted Handelsman's testimony that she never had any problems with plaintiff's performance.

 Plaintiff argues there is "absolute, distinct and specific proof that Dr. Weldy harbored animus against plaintiff" because Dr. Weldy "time and again" gave other employees additional pay for taking on additional duties." Dr. Weldy did not do the same for plaintiff but rather "testified that he did not believe what [plaintiff] put on his time sheets, basically accusing [plaintiff] of falsifying documents." However, plaintiff presents no evidence from which it can be inferred that plaintiff's race or sex was a factor in Dr. Weldy's not believing plaintiff's reported hours were "true and correct." Dr. Weldy testified "those were the hours that someone at a VP or presidential level would work." The level of plaintiff's job in the university's hierarchy appears to be the reason Dr. Weldy did not believe plaintiff's report of his hours was not true and correct. Nothing in the record supports the inference Dr, Weldy disbelieved the number of hours reported by plaintiff because of plaintiff's race or sex. Drawing such an inference would be speculative not reasonable.

 Likewise, nothing in the record suggests race or sex was a factor in Dr. Weldy testifying that Handelsman gave negative feedback on plaintiff's job performance when (taking the evidence most favorably to the plaintiff) she, in fact, had no problems with plaintiff's

performance. "[S]ummary judgment is the 'put up or shut up' moment in a lawsuit." Citizens for Appropriate Roads v. Foxx, 815 F.3d 1068, 1077 (7th Cir. 2016). Plaintiff must provide sufficient evidence to back up his claims. Id. Even assuming Dr. Weldy was lying, rather than just mis-remembering, about receiving negative feedback from Handelsman, there is no evidence from which it can be inferred the lie was motivated by plaintiff's race or sex. There is no evidence Dr. Weldy, himself an African-American man, had any animosity toward African-Americans or men. Without such evidence, any attempt to assign a motivation for the lie would simply be a guess.

Moreover, neither poor performance nor an assertion plaintiff overstated his hours was offered as a reason for not giving plaintiff additional compensation by Dr. Weldy. The reason Dr. Weldy offered was budgetary constraints which led to employees throughout the university being asked to take on new or additional duties without additional financial compensation. Since poor performance and overstating hours were not stated reasons for the action, they cannot be considered "dissembling to cover up a discriminatory purpose." David, 846 F.3d at 229.

Plaintiff identifies two white women, one African-American woman, and one white man he contends were similarly situated to him but received more favorable treatment. He argues this proves his race and sex were the reasons he did not receive additional pay.[4]

Plaintiff asserts Michele Hill, a white woman, is similarly situated to him and was treated more favorably than he. He argues Hill was, in effect, demoted, with her job responsibilities reassigned to plaintiff, but she continued to be paid the same salary she had been receiving before the reassignment. Hill was paid $15,000 more per year than plaintiff even after he assumed her duties.

Defendant argues plaintiff cannot base his Title VII claim on Hill as a similarly-situated employee who was treated more favorably than plaintiff because Hill left the position of Associate Director of Admissions for Marketing and Hobsons in October 2013. The limitations period for filing an EEOC charge is 300 days after the alleged unlawful employment practice. Defendant maintains it is on this date in October 2013, when Hill's duties changed, that the limitations period began to run. The court previously found [39] that "all discrete discriminatory acts that occurred before June 7, 2014 are outside the statutory limitations period.

"[A]n unlawful employment practice occurs, with respect to discrimination in compensation . . . , when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in

---

[4] Under the McDonnell Douglas framework for evaluating disparate pay claims, plaintiff has clearly met the burden of showing he is a member of a protected class and that he was performing his job in an acceptable manner. David, 846 F.3d at 226. The parties do not dispute whether there was an adverse employment action. The dispute is whether similarly-situated employees who were not African-American or male were treated more favorably than plaintiff.

whole or in part from such a decision or other practice." 42 U.S.C. § 2000e-5(e)(3)(A). Plaintiff's claim is that up to the time of his leaving defendant's employ he was subject to the unlawful employment practice of not being paid for the additional work he took on from Hill. Thus, plaintiff was "affected" by the asserted discriminatory compensation decision each time he was paid, up to and including, his final paycheck received at the end of his employment in March 2015. Groesch v. City of Springfield, 635 F.3d 1020, 1025 (7th Cir. 2011). The EEOC charge, therefore, was timely.

However, while the charge was timely, plaintiff has not shown that Hill is similarly situated to plaintiff for purposes of Title VII analysis. Plaintiff's claim is that he took on additional duties and did not have his compensation increased. Hill's situation is different. She did not take on additional duties. Her duties were reduced not increased.

The "court is not a super personnel department that second guesses employers' business judgments." Riley v. Elkhart Community Schools, 829 F.3d 886, 895 (7th Cir. 2016) (internal quotation marks and citation omitted). Plaintiff cites no authority which holds that an employer must reduce the pay of an employee whose job duties have been reassigned nor that an employer must increase the pay of the person to whom those duties were reassigned. The wisdom of doing so or not doing so is not for the court to decide. Plaintiff has not presented any evidence of any instance where defendant "in effect" demoted an employee and then reduced that employee's compensation and increased the compensation of the person taking over the duties of the demoted employee. Much less has he presented any evidence that women or Caucasians received increased pay in those circumstances but men or African-Americans did not.

Unlike Hill, who received the same pay for reduced duties, Buster-Williams, Garvey, and Dr. House all received additional pay for taking on additional positions while plaintiff did not receive any additional compensation for the additional duties he took on. Plaintiff argues they were similarly situated to him but were treated more favorably in this regard because they were either female (Garvey and Buster-Williams) or white (Garvey and Dr. House).

"[W]hether employees are similarly situated is a flexible common-sense, and factual inquiry. Relevant factors include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision." David, 846 F.3d at 225-26 (quotation marks and citations omitted).

Buster-Williams was plaintiff's supervisor. She served as the Director of Admissions and simultaneously as the Acting Associate Vice President for Enrollment Management. Plaintiff was a Research Associate to the Associate Vice President of Enrollment Management. The additional duties he took over were those of a half-time research associate in the Department of Testing Services and an Associate Director of Admissions for Marketing and Hobsons. Plaintiff clearly did not have the same job description as Buster-Williams. Her job was

significantly higher in the University's hierarchy than plaintiff's.  Both of the positions she was performing had greater levels of responsibility than the work plaintiff was doing.

Garvey was the Coordinator of University Admission Systems.  She took over the duties of the Director of Undergraduate Admissions in addition to continuing to work as the Coordinator of Undergraduate Admissions Systems.  As Director of Undergraduate Admissions, Garvey supervised twelve to fifteen admissions counselors and other staff.  The additional duties plaintiff took over were not on par with those taken over by Garvey.  He supervised only two graduate assistants.  The duties he took over were those of a half-time research associate and an Associate Director of Admissions for Marketing and Hobsons.  These positions were lower in the University's hierarchy than that of Director of Undergraduate Admissions taken over by Garvey.

Dr. House is the Director of Institutional Research for the University.  He took on the additional duties of the Associate Vice President for Enrollment Management while continuing to serve as the Director of Institutional Research when Buster-Williams left.  Both the Director of Institutional Research for the University and the Associate Vice President for Enrollment Management positions are significantly higher in the University's hierarchy than plaintiff's Research Associate position, and the half-time research associate duties and Associate Director of Admissions for Marketing and Hobsons he took over.

Dr. House, Garvey and Buster-Williams were not similarly situated to plaintiff.  Each of their positions was a higher level position than plaintiff's and the additional duties each of them took on were those of higher level positions than the duties plaintiff took on.  Buster-Williams and Dr. House were plaintiff's supervisors.  "[W]hether employees are similarly situated is a flexible common-sense, and factual inquiry." Id.  Looking at the facts, common sense says none of them was similarly situated to plaintiff.  Based on the foregoing, defendant is entitled to summary judgment on the Title VII claim.

"The Equal Pay Act forbids employers from paying different rates to men and women for the same work at the same establishment.  In order to establish a prima facie case under the Equal Pay Act, a plaintiff must show: (1) higher wages were paid to [an employee of the opposite sex as plaintiff], (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions.", Id., at 230 (internal quotation marks and citation omitted).  "In determining whether two jobs are equal, we look to whether the jobs have a common core of tasks, i.e., whether a significant portion of the two jobs is identical.  Once a plaintiff establishes a common core of tasks, we ask whether any additional tasks make the jobs substantially different." Id. (internal quotation marks and citations omitted).  "In making this determination, the court looks to the actual job duties performed by each employee, not his or her job description or title." Id. (internal quotation marks and citation omitted).

Plaintiff's complaint alleges defendant paid wages to plaintiff "at a rate less than it paid to other employees of the opposite sex for the same or substantially similar work."  The

complaint specifically identifies Garvey, Buster-Williams and Hill as women who were paid more than plaintiff. In his brief, plaintiff only advances an argument as to Hill. He says nothing about Garvey or Buster-Williams. Plaintiff has presented no evidence at all concerning how his job required substantially similar skill, effort and responsibilities as those of Garvey and Buster-Williams. Moreover, it is evident from the discussion of the evidence above concerning plaintiff's Title VII claim, that plaintiff has not established "a common core of tasks" between his job and the jobs of Garvey and Buster-Williams. Both Garvey and Buster-Williams held higher level positions than plaintiff. Plaintiff has failed to provide sufficient evidence to back up his Equal Pay Act claim as to Garvey and Buster-Williams. Citizens, 815 F.3d at 1077.

As to Hill, plaintiff argues "a review of the facts that support the Equal Pay Act claim show that there is no question that Plaintiff has demonstrated that Michele Hill was paid more, for a job that was basically taken over in a significant way by [plaintiff], under the exact same working conditions."[5] "On summary judgment a court may not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Washington v. Haupert, 481 F.3d 543, 550 (7th Cir. 2007) (quotation marks and citations omitted). The facts are viewed most favorably to plaintiff, the non-moving party. Id.

It is undisputed that Hill was paid $15,000 more than plaintiff when she served as Associate Director of Admissions for Marketing and Hobsons. Plaintiff testified in his deposition that he took over the full-time duties of Hill's position in October 2013. This included anything related to the management of the Hobsons software as well as the marketing effort of the university and the overall oversight of all of the software duties. It is undisputed that plaintiff did not receive an increase in compensation when he took over these duties. So, at the time plaintiff was performing the full-time duties of the Associate Director of Admissions for Marketing and Hobsons, plaintiff was paid $15,000 less than Hill was paid when she held the position.

 Hill testified in her deposition that when she took over responsibility for the call center plaintiff "took over some of the e-mailing that was going on" from her. Dkt # 72-4, p. 27. When asked if plaintiff took over any of her other responsibilities in Hobsons she replied: "Not that I know of. I was still working in Hobsons as part of my new call center added responsibilities." Dkt # 72-4, p. 27. There is also evidence that plaintiff took over a significant part of Hill's duties as Associate Director of Admissions for Marketing and Hobsons but not all of those duties. Defendant also notes that plaintiff could not identify all of the duties of the Associate Director of Admissions for Marketing and Hobsons when asked to do so in his deposition.

---

[5] Plaintiff argues defendant is precluded from making any argument in support of its motion on the Equal Pay Act claim because defendant's opening brief relied only on the plaintiff's failure to file an EEOC charge within 300 days of the cause of action's accrual as a basis for challenging the Equal Pay Act claim. Defendant withdrew that argument in its reply brief. (The Equal Pay Act does not require the filing of an EEOC charge.) However, defendant's opening brief, in addressing plaintiff's Title VII claim, does contain argument as to why Hill was not performing the same job as plaintiff and plaintiff controverted this argument in his response brief. The issue of substantial similarity has been raised sufficiently for the court to address it.

However, it is not for the court to weigh the evidence or make credibility determinations on summary judgment. Washington, 481 F.3d at 550. Taking the evidence most favorably to plaintiff, Hill, a woman, was paid more than plaintiff was paid, when she was performing the same job duties under the same working conditions. Though narrowly, plaintiff has established a prima facie case under the Equal Pay Act. David, 846 F.3d at 230.

Once the prima facie case is made, the burden shifts to defendant to establish one of four statutory defenses. Warren v. Solo Cup Co. 516 F.3d 627, 629-30 (7th Cir. 2008). "The statutory defenses kick in if the difference in pay is attributed to '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.' 29 U.S.C. § 206(d)." Id., at 630. Defendant has not argued any of the statutory defenses apply. Defendant argues only that plaintiff and Hill had different job duties but that is a disputed material fact.

For the foregoing reasons, defendant's motion [64] for summary judgment is granted in part and denied in part. Summary judgment is granted as to the Title VII claim set forth in Count I and denied as to the Equal Pay Act claim set forth in Count III. The Title VII retaliation claim set forth in Count II is dismissed per plaintiff's request. The parties are directed to contact Magistrate Judge Johnston within thirty days of the entry of this order to schedule a settlement conference or arrange for mediation.

Date: 4/06/2017                    ENTER:


_____
                    United States District Court Judge


Electronic Notices. (LC)


9